UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:                                          Case No.: 14-37217-BKC-AJC

CAI International, Inc.                          Chapter 11

                    Debtor.                     *Hearing: February 4, 2015 @ 3pm*
_____/

### DEBTOR'S EXPEDITED MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE SALE OF THE DEBTOR'S STORE RELATED ASSETS PURSUANT TO 11 U.S.C. § 363 FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES

CAI International, Inc., debtor and debtor-in-possession (the "Debtor"), and pursuant to section 363 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), hereby files this motion (the "Motion") seeking entry of an order authorizing the sale of the Debtor's store related assets to WirelessPCS FL, LLC (the "Purchaser"), or to such alternative purchaser(s) as may be determined to have submitted the highest and best offer for the purchase of the Debtor's assets pursuant to the terms of the bidding procedures provided herein, subject to the terms and conditions of the Purchase Agreement (as defined below) (or, as applicable, any alternative purchase agreement found to constitute a higher and better offer for the Debtor's assets), free and clear of any and all claims (including "claims" as defined in Section 101(5) of the Bankruptcy Code), mortgages, pledges, liens, security interests, interests, charges, encumbrances, setoffs, recoupments, cure claims, liabilities, debts, indebtedness, costs, damages, judgments or obligations of any character whatsoever and whenever arising, either before or after the Petition Date (collectively, the "Encumbrances"). In support of this Motion, the Debtor respectfully states as follows:

### LOCAL RULE 6004-1 SUMMARY OF RELIEF REQUESTED

1.      By this Motion, the Debtor seeks authority to sell substantially all of the

Debtor's *store related* assets to the Purchaser, subject to the terms and conditions of the Purchase Agreement, or to such alternative purchaser(s), subject to combination, as may be determined to have submitted the highest and best offer for the purchase of the Debtor's assets pursuant to the terms of the bidding procedures contained herein, and as approved by the Bankruptcy Court.  In accordance with Local Rule of Bankruptcy Procedure 6004-1, the Debtor hereby provides the following summary of the material terms of the Purchase Agreement.[1]  The summary provided includes references to the applicable material provisions in the Purchase Agreement:

| CATEGORY | SUMMARY OF MATERIAL TERM |
|---|---|
| **Purchaser** | Wireless PCS FL, LLC |
| **Assets to be Sold** | **"AS IS, WHERE IS"**, without any warranty, either express or implied, all of Debtor's right, title and interest of every kind and nature in each of the Acquired Stores as of the Closing Date. |
| | The Acquired Stores are comprised of the following locations, all located in Miami-Dade County, Florida: |
| | (a)   15935 N.W. 57th Avenue (Store Front Only)   Miami Lakes, Florida; |
| | (b) 3705 W. 20th Avenue, Hialeah, Florida; |
| | (c) 1138 W. 49th Street, Hialeah, Florida |
| | (d) 18600 N.W. 87th Avenue, Miami, , Florida. |
| | (e) 957 S.W. 27th Avenue, Miami, Florida. |
| | (f)  635  W. 49th Street, Hialeah, Florida |
| | The assets to be sold do not include certain Excluded Assets, including all of the Debtor's inventory, furniture, fixtures and equipment (except |

---

[1]      Unless otherwise defined herein, capitalized terms used in the summary below shall have the meaning ascribed thereto in the Purchase Agreement, the latest form of which as proposed by the Acquired Leases and Purchase Agreement are attached hereto.

| | |
|---|---|
| | to the extent physically located within an Acquired Store), cash, checks, cash equivalents, credit card receipts for transactions prior to Closing, and cash and deposits in the Debtor's bank accounts, which the Debtor earned as of the Closing Date. |
| **Purchase Price;**<br><br>**Collateral Security** | The purchase price to be paid by the Purchaser for the Store Assets is $1,300,000, with $600,000 paid in cash at Closing and the balance to be paid in six equal consecurtive installments of principal beginning on the 30th day following the Closing Date and on that day for each subsequent month until the Purchase Price is paid in full. As collateral security for the payment of the $700,000.00, the Debtor shall maintain a first lien security interest in the acquired assets and shall collaterally assign the security interest to Fifth Third Bank. |
| **Deposit** | The Purchaser has placed an earnest money deposit of **$ 60,000**(the "Deposit") into an escrow account with the Debtor's counsel, Joel M. Aresty, P.A. |
| **Cure Costs** | At the Closing, the Debtor shall make payment on behalf of the Debtor of the Cure Costs due and owing through January 31, 2015 (as defined below) as follows:<br><br>(i) With respect to Cure Costs that have been finalized and determined by the Bankruptcy Court before the Closing, Debtor shall pay directly to the respective counterparties to the Acquired Leases, by wire transfer of immediately available funds, the full amount of each such party's Cure Cost, as specified in the Sale Order or such other order(s) of the Bankruptcy Court regarding the amount of Cure Costs associated with any Acquired Leases;<br><br>(ii) Debtor shall deposit an amount equal to the aggregate amount of Cure Costs, if any, that remain in dispute between the Debtor and the respective counterparties to the Assumed Lease as of the Closing Date into an escrow account to be established pursuant to the Sale Order or such other order(s) of the Bankruptcy Court regarding the amount of Cure Costs associated with any Assumed Lease.<br><br>**Purchaser is responsible for all amounts due under any Assumed Lease beginning February 1, 2015** |
| **Closing Date** | The consummation of the transactions contemplated by the Purchase Agreement shall take place within ten (10) days after the earlier of (i) entry of the Sale Order if the Sale Order contains findings under Section 363(m) of the Bankruptcy Code or, if such a finding is not made by the Bankruptcy Court, (ii) the Sale Order becomes final |

| | |
|---|---|
| | and non-appealable, but not later than February 16, 2015, or (iii) on such other date or at such other time as may be mutually agreed to by the parties (the "Closing Date") and shall be effective as of 11:59 p.m. on the Closing Date. |
| **Conditions to Closing** | The obligations of the Purchaser to consummate the transactions contemplated by the Purchase Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which may be waived by the Purchaser, in its discretion:<br><br>(a) the Bankruptcy Court shall have entered the Sale Order, approving the Purchase Agreement, and the Assignment Order, approving the Debtor's assumption and assignment of the non-residential real property leases on the Debtor's Acquired Stores, authorizing the transactions contemplated by the Purchase Agreement, and such Orders shall be in full force and effect and final, and no Order staying, reversing, modifying, vacating or amending such Orders shall be in effect on the Closing Date; and; the Debtor shall have delivered a Quit Claim Bill of Sale for all of the Store Assets that are tangible personal property, without representation, warranty or covenant of any kind.<br><br>(b) on or before January 30, 2015, if the Purchaser is unable to negotiate acceptable amendments to the Acquired Leases and provide timely notice of termination of the Purchase Agreement. |
| **Auction Terms** | The Purchase Agreement is subject to the submission of higher and better offers pursuant to the procedures below.<br><br>**Auction and Bid Deadline**<br><br>The auction (the "**Auction**") to consider any competing bids for the purchase of one or all of the Store Assets, subject to combination, will be held at **10:00 a.m. on February 4, 2015** at Gray Robinson, P.A., 333 S.E. 2nd Avenue, Suite 3200, Miami, Florida 33131.  Only parties that have submitted a Qualified Bid (defined herein) that is received by no later than **February 2, 2015 at 5:00 p.m.** (prevailing Eastern Time) (the "**Bid Deadline**") by Debtor's counsel named below (email address: Aresty@mac.com) with a copy served upon Bank's counsel, Roy S Kobert (email address Roy.Kobert@Gray-Robinson.com) may participate at the Auction.<br><br>**Sale Hearing**<br><br>The hearing (the "**Sale Hearing**") to consider approval of the sale of the Debtor's assets to the Purchaser under the Purchase |

| | |
|---|---|
| **Auction Terms (Cont.)** | Agreement or an alternative Prevailing Bidder (as defined in the Bid Procedures Order) free and clear of all liens, claims and encumbrances will be held before The Honorable A. Jay Cristol, United States Bankruptcy Court, C. Clyde Atkins U.S. Courthouse, 201 N. Miami Avenue, Miami, Florida 33128, on **February 4, 2014 at 3:00 p.m.** (prevailing Eastern Time).<br><br>**Qualified Bids**<br><br>In order to participate in the bidding process and Auction (as defined below) and be deemed a "**Qualified Bidder**," each competing bidder (each, a "**Bidder**") must (A) enter into a confidentiality agreement if it wishes to review financial information on the Acquired Stores; (B) provide the Debtor with a good faith deposit in immediately available funds in the amount of $60,000.00 (the "**Bid Deposit**"), and submit a written bid ("**Bid**") for either (i) substantially all of the Debtor's Assets in an amount equal or greater than $1,300,000 or (ii) for one or more of the Acquired Stores with the following minimum bids: (a "**Qualified Bid**"), which shall, among other things, (C) include financial information supporting such Bidder's ability to consummate the transaction proposed by their Bid with no financing contingencies, ajudged in the Debtor's sole and absolute discretion; (D) a copy of the initial written purchase offer in the form of an asset purchase agreement, executed by such Bidder, in substantially the form of the Purchase Agreement (the "**Bidder's Agreement**"); provided, however, that any Bidder's Agreement which contains terms different from the Purchase Agreement must be black-lined to show any changes made by such Bidder to the form of the Purchase Agreement, and must be signed by such Bidder and be subject to acceptance by the Debtor in consultation with the Bank, and necessary Court approval; and (E) provide proof that such Bidder presently holds an Exclusive Indirect Dealer Agreement in good standing or other licensing agreement with MetroPCS. For the avoidance of doubt, **A BIDDER WILL NOT BE CONSIDERED A QUALIFIED BIDDER IF A BIDDER IS NOT PRE-APPROVED BY METROPCS AS A LICENSED DEALER PERMITTED TO PURCHASE ONE OR MORE OF THE STORE ASSETS AS OF THE BID DEADLINE.**<br><br>**Breakup Fee**<br><br>If the Bankruptcy Court enters a Sale Order which declares the Bid from a Bidder other than the Purchaser as "highest and best," then the Purchaser shall be entitled to a breakup fee of $25,000.00 upon a Closing with the other Bidder. In exchange for the Breakup Fee the |

Purchaser shall share all due diligence with the Debtor including any proposed amendments to the Acquired Leases negotiated with the counterparty.

**Overbid Amount**

The initial overbid amount at the Auction for the sale of the Store Assets must exceed the Purchase Price by $25,000 (the "**Overbid Amount**").

**Incremental Bids**

Following the submission of a Bid that meets the Overbid Amount, Qualified Bidders participating at the Auction may then submit successive bids in increments of $10,000 or such other amounts as may be established by the Debtor as announced at the Auction.

**Back-Up Bid**

At the conclusion of the Auction, the second best bid shall be announced. The second best bid shall remain as the Back-Up Bidder until Closing. If the winning bidder fails to close, the second best bid shall be required to go to Closing utilizing the terms of its bid.

**Auction Procedure**:

Announced terms at the Auction shall supercede all terms herein and will be conducted by the Debtor in consultation with the Bank. Any objections to the Auction process, or the announced results of the Auction must be raised at the Sale Hearing or shall be deemed waived, withdrawn or permanently foreclosed.

**Liquidated Damages:**

All Qualified Bidders agree that should they fail to close (unless due to fault of the Debtor) then they shall irrefutably forfeit their deposit as liquidated damages in favor of the Debtor.

| | |
|---|---|
| **Identity of Lienholders** | The Debtor's Bankruptcy Schedules lists the Bank as their only Secured Creditor, which indebtedness is not contingent, disputed or unliquidated. The Debtor believes the Bank has a valid, perfected secured interest senior to all other creditors, in substantially all of the Debtor's assets, including the Store Assets. |

|  |  |
|---|---|
|  |  |

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).  Venue is proper in this District and before this Court under 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief sought in this Motion are 11 U.S.C. §§ 105, 363, 1107 and 1108 and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

4.      On December 12, 2014 (the "Petition Date"), the Debtor commenced this case by filing of a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

5.      As noted in prior filings before this Court, the Debtor operates retail cellular phone stores at the following leased locations (the "Stores"):

- 3705 W. 20th Avenue, Hialeah, Florida;

- 1138 W. 49th Street, Hialeah, Florida

- 18600 N.W. 87th Avenue, Miami Florida.

- 957 S.W. 27th Avenue, Miami, Florida.

- 635  W. 49th Street, Hialeah, Florida

6.      The Debtor has been managing the Debtor's businesses and operations with the ultimate aim of effectuating an auction sale of the Debtor's assets as a going concern, on the basic terms set forth below, to maximize value for distribution to creditors and other stakeholders in this case.

7.      On December 29, 2014, the Debtor filed its Bankruptcy Schedules which lists

Fifth Third Bank (the "Bank") as the only secured creditor, in an amount which is not contingent, disputed or unliquidated (the "Bank Debt") [D.E. #30].  The Debtor believes the Bank maintains a senior perfected security interest in substantially all of the assets of the Debtor, including the assets relating to the Stores which the Debtor proposes to sell (the "Store Assets").

## I.    Sale Efforts, Bidding Procedures, and Summary of Asset Purchase Agreement

*A    Determination to Sell the Store Assets and Execution of Asset Purchase Agreement*

8.    The Stores are operated as "Metro PCS" licensed locations and the Debtor is subject to a License Agreement (the "Metro PCS Agreement") with its licensor, MetroPCS Communications, Inc. ("Metro PCS").  The Debtor is an authorized Metro PCS dealer.  Within the Stores, the Seller sells MetroPCS service plans, mobile telephones, peripherals and accessories related to the mobile telephone business.  In addition, the Debtor serves as a payment depot for MetroPCS customers.  More information about the Debtor's MetroPCS business may be gathered at www.metropcs.com.  In 2013, the Debtor's gross revenues slightly exceeded $38 Million.  In 2014, the Debtor successfully sold many of its stores as a going concern.  As a direct result, as of the Petition Date, the Debtor's year to date revenues just passed $23 Million.

9.    As required under section 365(c) of the Bankruptcy Code, the Debtor will assume and then assign the Metro PCS Agreement to the successful bidder.

10.    The Debtor has determined that it would be in the best interests of the Debtor, its creditors, and its stakeholders to maximize value through a sale of the Store Assets under section 363 of the Bankruptcy Code, free and clear of any liens, security interests, claims,

charger or encumbrances in accordance with section 363(f) of the Bankruptcy Code, pursuant to the procedures set forth herein.  Absent such a sale, the Debtor would most likely be facing a liquidation under chapter 7 of the Bankruptcy Code which would achieve far less for creditors than a sale as a going concern.  As presently contemplated, the sale will be pursuant to section 363 of the Bankruptcy Code and not pursuant to a plan of reorganization.

11.    After the exercise of due diligence, and after actively communicating with various parties that have expressed interest in pursuing a transaction for the purchase of the Store Assets, the Debtor has determined to undertake a sales process with Wireless PCS FL, LLC

12.    Specifically, the Purchaser has proposed an Asset Purchase Agreement (the "Purchase Agreement"), which provides for the sale by the Debtor, and the purchase by the Purchaser, of all of the store-related assets of the Debtor for $1,300,000, plus the cost value of the sale offer and accessories located at each of the Stores.  A copy of the Purchase Agreement as proposed by the Purchaser is attached to this Motion as Exhibit A and is incorporated herein by this reference thereto.[2]

C.    *Summary of Asset Purchase Agreement*

13.    As noted in the summary provided above, the Debtor and the Purchaser—*an existing MetroPCS licensed dealer which currently operates approximately 200 Metro PCS licensed stores in Florida* —executed the Purchase Agreement, which provides for the Purchaser's acquisition of the Store Assets for $1,300,000, with $600,000 in cash paid at

---

[2]    In order to reduce photocopying and mailing costs, a copy of the Purchase Agreement is being mailed only to those parties designated as such in the Certificate of Service below.  A copy of the complete Purchase Agreement is on file with the Court and is available for inspection and photocopying during the normal business hours of the Office of the Clerk of the United States Bankruptcy Court, C. Clyde Atkins United States Courthouse, 301 N. Miami Avenue, Room 150, Miami, FL 33128. A copy of the complete Purchase Agreement may also be obtained upon written request to the undersigned counsel for the Debtor.

Closing and the balance to be paid in equal installments within six months from the Closing Date.

14.     The principal business terms of the Purchase Agreement[3] are as follows:[4]

(a)     **Transfer of Operating Assets.** At the Closing, the Debtor shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all Liens, Claims and Interests and Purchaser shall purchase from the Debtor "AS IS, WHERE IS", without any warranty, either express or implied, any of Seller's right, title and interest of every kind and nature (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise) in each of the Stores as of the Closing Date, whether tangible or intangible, real or personal (collectively, the "Store Assets"), but excluding the Excluded Assets:

(i)     The leased real property of the Debtor relating to the Stores leased pursuant to the leases included in the Acquired Leases (as defined below), including all Leasehold Improvements thereon (collectively, the "Leased Real Property");

(ii)     All tangible personal property of the Debtor, including but not limited to all machinery, equipment, supplies, materials, furniture, computers, fixtures, trade fixtures, computer equipment, hardware, telephone systems, computing and telecommunications equipment, safes and alarms, and other items of personal property owned or leased by the Debtor for use in the Acquired Stores, and all warranties and licenses thereunder or related thereto; but excluding all computer hardware and systems not physically residing in an Store location;

(iii)     All advertising and promotional materials and any rights thereto possessed, or entitled to be used, by the Debtor;

(iv)     All permits, registrations, Orders, operating permits, certificates of occupancy, approvals, authorizations and licenses (collectively, the

---

3       The description of the principal business terms of the Purchase Agreement contained in this Motion is intended as a summary only and is qualified in its entirety by reference to the Purchase Agreement itself and, to the extent there is any inconsistency between the language of the Purchase Agreement and the description thereof set forth in this Motion, the Purchase Agreement shall control.  Each creditor of the Debtor and party in interest should read, consider, and carefully analyze the terms and provisions of the Purchase Agreement.

4       Unless otherwise defined herein, capitalized terms shall have the meaning ascribed thereto in the Purchase Agreement.

"Permits") issued to the Debtor by any Government or other third party relating to the Acquired Stores, to the extent transferrable;

(v)     All books, files and records held or otherwise owned by the Debtor in the Debtor's possession or control that relate to current or former employees and other personnel, including, without limitation, books, files and records that are related to medical history, medical insurance or other medical matters and to workers' compensation and to the evaluation, appraisal or performance of current or former employees and other personnel of the Debtor (collectively, the "Employee Records");

(vi)    Copies of all books, files and records of sales and general business operations of the Acquired Stores and the Debtor's supplier lists for the Acquired Stores in Debtor's possession or control or to which Debtor has access ("Business Records");

(vii)   All goodwill as a going concern and all other right, title and interest of the Debtor in and to the general intangibles incident to Debtor's business at the Acquired Stores;

(viii)  All telephone numbers, fax numbers, email addresses, websites, URLs and Internet domain names of the Debtor at or related to the Acquired Stores.

(b)     **Excluded Assets.** The Purchaser will not be purchasing, and the Debtor shall retain all rights, title and interests in, to and under those assets, properties and rights of the Debtor that are not included in or used in the operation of the Acquired Stores and the following assets (collectively, the "Excluded Assets"):

(i)     All of the Debtor's cash, checks, cash equivalents, credit card receipts for transactions prior to Closing, cash and deposits in the Debtor's bank accounts, cash-in-transit and all accounts receivable of which the Debtor earned as of the Closing Date, other than the On-Hand Cash;

(ii)    All inventory, all furniture, fixtures and equipment not physically located at an Acquired Store;

(iii)   All equity ownership interests in the Debtor;

(iv)    All rights to refunds of, credits for, and Claims in connection with Taxes of the Debtor, and any records relating to Taxes of the Debtor;

(v)     All insurance premiums, claims for refunds of premiums for insurance policies, policies, contracts and coverage obtained by the

Debtor, and all rights to insurance proceeds or other Contracts of insurance or indemnity (or such similar agreement) recoveries;

(vi)     All avoidance Claims and causes of action arising under chapter 5 of the Bankruptcy Code or any other fraudulent transfer statue and any related Claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, any and all Claims and causes of action against any present or former member, officer, director of the Debtor, any and all Claims and causes of action against any present or former Insider of the Debtor, and the proceeds from any of the foregoing;

(vii)    All rights of and benefits to the Debtor under the Purchase Agreement, or the Ancillary Agreements, or under any other agreements or instruments otherwise delivered, executed or made in connection with the Purchase Agreement;

(viii)   Each Contract to which the Debtor is a party that does not constitute an Acquired Lease, and all deposits, Claims, rebates or refunds thereunder or related thereto;

(ix)     All prepaid expenses and deposits of the Debtor made by the Debtor since the filing of the Bankruptcy Case and any retainers paid to professionals (the "Excluded Deposits") and the right to receive and retain all mail and other communications of the Debtor;

(x)      Corporate seals, minute books, charter documents, stock transfer records, record books, original Tax and financial records and such other files, books and records relating to any of the Excluded Assets or to the organization, existence or capitalization of the Debtor;

(xi)     Contracts that Purchaser has identified prior to the Closing that Purchaser will not assume at Closing; and

(xii)    Computer hardware and systems not physically residing in an Acquired Store location (except as may be the subject of an Acquired Lease); and

(xiii)   The commercial bays located at 15935 N.W. 57th Avenue, Miami Lakes, Florida encompassing the Samsung authorized repair facility; the Debtor's corporate office and warehouse facility, including but not limited to the related assets and licenses associated thereto..

(c)     **Purchase Price and Assumed Liabilities.** The purchase price to be paid by the Purchaser for the Acquired Stores is $1,300,000 (the

"Base Purchase Price"), as provided below.

The cash consideration ("Cash Consideration") payable to the Debtor at closing shall be equal to $600,000 (A) plus or minus the Prorated Amounts of certain ongoing business liabilities (B) plus the amount of any security deposit in favor of the Debtor in connection with any assumed Leased Real Property; (C) plus the cost value of the cellular phone and accessory inventory located at each of the Acquired Stores as of the Closing Date; (D) plus any fees or costs imposed by MetroPCS in connection with the transfer of the Store Assets and (E) less the Deposit, which shall be delivered to the Debtor at Closing.  The balance of the Base Purchase Price shall be paid in six (6) equal and consecutive installments, with the first installment due on or before the thirtieth (30) day following the Closing date, and on the same day of each month thereafter until the Purchase Price is paid in full.  Fifth Third Bank shall be granted a security interest in all assets of the Purchaser as collateral security for the payment of the unpaid portion of the Purchase Price as of the Closing Date.

(d)　**Deposit.** The Purchaser has placed an earnest money deposit of $__60,000 (the "Deposit") into an escrow account with the Purchaser's counsel, Leonard Oshinsky.

(e)　**Cure Costs.** At the Closing, the Debtor shall make payment of the Cure Costs  (as defined below) as follows:

(i)　With respect to Cure Costs that have been finalized and determined by the Bankruptcy Court for the period ending January 31, 2015, the Debtor r shall pay directly to the respective counterparties to the Acquired Leases, by wire transfer of immediately available funds, the full amount of each such party's Cure Cost from the closing proceeds, as specified in the Sale Order or such other order(s) of the Bankruptcy Court regarding the amount of Cure Costs associated with any Acquired Lease;

(ii)　The Debtor  shall deposit an amount equal to the aggregate amount of Cure Costs, if any, that remain in dispute between the Debtor and the respective counterparties to the Acquired Lease as of the Closing Date (the "Cure Costs Dispute Escrow Amount") into an escrow account (the "Cure Costs Dispute Escrow Account") to be established pursuant to the Sale Order or such other order(s) of the Bankruptcy Court regarding the amount of Cure Costs associated with any Acquired Lease.

(iii)　All Cure Costs for the period beginning February 1, 2014 through the Closing Date shall be assumed by the Purchaser and paid directly by the Purchaser.

(f) **Bankruptcy Court Approval.** The Purchaser's obligation to close under the Purchase Agreement is subject to the Bankruptcy Court's entry of the Sale Order and the Assignment Order authorizing the transactions contemplated by the Purchase Agreement.

(g) **Closing.** The consummation of the transactions contemplated by the Purchase Agreement (the "Closing") shall take place within ten (10) days after the earlier of (i) entry of the Sale Order if the Sale Order contains findings under Section 363(m) of the Bankruptcy Code or, if such a finding is not made by the Bankruptcy Court, (ii) the Sale Order becomes final and non-appealable, or (iii) on such other date or at such other time as may be mutually agreed to by the parties (the "Closing Date") and shall be effective as of 11:59 p.m. on the Closing Date. In no event shall the Closing Date be after February 16, 2015.

## RELIEF REQUESTED

15.    By this Motion, the Debtor requests that this Court enter an Order pursuant to Sections 363(b), (f), and (m) of the Bankruptcy Code, and Rule 6004 of the Federal Rules of Bankruptcy Procedure, approving the Purchase Agreement and the sale of the Store Assets to the Purchaser, or to such alternative purchaser as may be determined to have submitted the highest and best offer for the purchase of the Debtor's assets pursuant to the terms of this Court's Bidding Procedures Order, subject to the terms and conditions of the Purchase Agreement, free and clear of all Encumbrances.

16.    Pursuant to section 363(f) of the Bankruptcy Code, a Debtor or debtor in possession may sell all or any part of property of the estate, free and clear of any and all liens, claims, encumbrances or interests if:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)    such interest is in bona fide dispute; or

     (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). The Debtor believes that one or more of the tests of section 363(f) will be satisfied with respect to the proposed sale of the Store Assets. **In particular, the Debtor believes that at least section 363(f)(2) will be met because the Debtor contemplates the Court approving a final cash collateral order which will meet with the Bank's unilateral approval. If a cash collateral order in a form acceptable to the Bank is approved before the Sale Hearing, then the bank will not exercise its credit bid rights under section 363(k) and shall consent to a sale so long as the Purchase Price for all six (6) stores is no less than $1,300,000**. In exchange for forgoing this valuable right, the Bank has secured certain concessions from the Debtor more fully set forth in  the cash collateral order to be heard simulatneously with the Sale Hearing, which terms will be solidified between the Bank and the Debtor before the Bid Deadline. Should the Bankruptcy Court not approve such terms, than the Bank reserves the right to exercise its credit bid rights at the Sale Hearing.

     17.    In addition to being sold free of liens, section 363(b)(1) of the Bankruptcy Code provides that, after notice and a hearing, the Debtor may sell property of the estate outside of the ordinary course of business. 11 U.S.C. §363(b)(1). Courts interpreting section 363(b)(1) consider four factors in approving non-ordinary course sales of estate assets: (a) the sale is supported by the sound business judgment of the debtor's management; (b) interested parties are provided with adequate and reasonable notice; (c) the sale price is fair and reasonable; and (d) the purchaser is acting in good faith. *See, e.g., In re Delaware Hudson Ry. Co.*, 124 B.R. 169 (D. Del. 1991); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (D. Del. 1987); *In re Condere Corp.*, 228 B.R. 615 (Bankr. S.D. Miss. 1998); *WBQ P'Ship v. Virginia*, 189 B.R. 97 (Bankr. E.D. Va. 1995).

18.     For all of the reasons set forth in this Motion, the Debtor, through the exercise of his business judgment, has determined that the sale of the Store Assets to the Purchaser pursuant to the Purchase Agreement, or to such alternative purchaser as may submit a higher and better bid for the acquisition of the Store Assets at the Auction is in the best interests of the Debtor, its creditors and its estates. The Debtor has engaged in extensive efforts to market the Store Assets and has determined that the proposed purchase price offered by the Purchaser is the highest and best offer received, is reasonable, represents fair market value, and the proposed sale is in the best interests of the estates. Moreover, the proposed sale is subject to higher and better offers which will insure that the price is fair and reasonable, and that, if a higher and better offer is ultimately received, the Debtor may proceed with that alternative transaction pursuant to the relief requested in this Motion.

19.     By entering into the Purchase Agreement and delivering the Deposit, the Purchaser consents to the personal and exclusive subject matter jurisdiction of the Bankruptcy Court with respect to any disputes arising under the Purchase Agreement or with respect to the Deposit.

20.     The Purchase Agreement was negotiated in good faith and at arm's length between the Purchaser and the Debtors.

21.     At the Sale Hearing, the Debtor will request that the Court enter an order waiving the 14-day stays set forth in Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure and providing that the order granting this Motion be immediately enforceable and that the closing under the Purchase Agreement may occur immediately.

22.     In addition to the parties entitled to service pursuant to 2002 of the Federal

Rules of Bankruptcy Procedure, the Debtor will also circulate this Sale Motion to MetroPCS with a request that it be shared with its dealer network, all other parties which have expressed an interest in acquiring the Store Assets or have been previously identified by MetroPCS as a potential buyer.

23.     Amended Real Property Leases; Deadline to Terminate the Purchaser Agreement on or before January 30, 2015, if the Purchaser is unable to negotiate amendments to the Acquired Leases satisfactory to the Purchaser and Notice is timely given.  If the Purchaser properly terminates the Purchase Agreement, the Deposit will be returned and no Breakup Fee will be due and owing the Purchaser.

WHEREFORE, the Debtor respectfully requests that the Court enter an order (i) granting the relief requested herein, (ii) authorizing the sale of the Store Assets to the Purchaser pursuant to the terms of the Purchase Agreement, or to such alternative purchaser as may be determined to have submitted the highest and best offer for the purchase of the Debtor's assets, subject to the terms and conditions of the Purchase Agreement, and (iii) granting such other and further relief as this Court may deem just and proper.

Date: January 23, 2015                     Respectfully submitted,

JOEL M. ARESTY, P.A.
309 1st Avenue, South
Tierra Verde, FL 33715
Telephone:     (305) 899-9876
Facsimile:     (305) 723-7893

By:____/s/ Joel Aresty_____
       Joel Aresty, Esq.
       Fla. Bar. No.
       *Counsel to the Debtor*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a true and correct copy of the foregoing Motion to be served on this 20th day of January, 2015 upon all interested parties registered to receive notification via this Court's CM/ECF notification system and via First Class U.S. Mail upon all parties listed on the attached service list,

*/s/ Joel Aresty, Esq._____*

.

## AGREEMENT

THIS AGREEMENT made this _____ day of January, 2015, between WIRELESSPCS FL, LLC, a Florida limited liability company, hereinafter called the "Purchaser," having its address at 14537 Military Trail, Suite B, Delray Beach, FL 33484, and CAI INTERNATIONAL, INC., a Florida corporation, the Debtor in Possession, hereinafter called the "Seller," having its principal place of business at 15935 NW 57th Avenue, Hialeah, FL 33014.

### W I T N E S S E T H:

WHEREAS, the Seller is the owner and operator of a cellular phone store business conducted at six (6) leased premises and is willing to sell specific assets of the business conducted at those six (6) locations which are noted on Exhibit "A" attached hereto, all as more fully set forth in this Agreement; and

WHEREAS, the Seller is the Debtor in Possession ("Debtor") under Chapter 11 of the United States Bankruptcy Code (the "Code") pursuant to a voluntary petition filed on December 12, 2014 in the United States Bankruptcy Court Southern District of Florida (the "Court") under Case number 14-37217-BKC-AJC.

WHEREAS, the sale of the business assets which are the subject of this Agreement is being conducted pursuant to Section 363 of the Code upon requisite notice to creditors, including all taxing authorities, and a hearing on proper notice.

WHEREAS, the Purchaser is willing to buy those assets of the referred to business, as more fully set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and Ten and no/100ths ($10.00) Dollars in hand each paid to the other and hereby acknowledged, it is agreed that:

1.   The above representations are true and correct.

2.   The Seller shall sell to the Purchaser the following assets of the business conducted at the above-noted leased premises: saleable inventory of cellular phones and accessories; leasehold improvements, including fixtures; furniture and equipment; goodwill, and the telephone numbers as noted on the store-by-store schedule attached hereto as Exhibit "B." The Seller shall also assign its leases of the six (6) leased premises, to Purchaser, subject, however, to the terms of this Agreement, and a credit to Seller, at closing for all lease deposits and prepaid rents on a store by store basis. The equipment and furnishings to be transferred have been examined by both parties hereto, it being agreed between them that such equipment and furnishings are those on the leased premises on the date of this Agreement. A list of the equipment and furnishings to be transferred, on a store-by-store basis, is attached as composite Exhibit "C."

3.   The sale of assets herein provided for shall be made free and clear of all liabilities, obligations, security interests and encumbrances, including, but not limited to, the Seller's

2

obligations for Florida sales tax, as set forth in section 363(f) of the Code.

4.    Only those assets of the Seller specifically provided for herein are the subject of this purchase and sale agreement; the remaining assets, including, but not limited to, cash on hand or in bank, and accounts receivable, are not the subject of this Agreement, nor are they being transferred hereby.

5.    The purchase price of the assets being transferred hereby is One Million Three Hundred Thousand and no/100ths Dollars ($1,300,000.00), plus the cost value of all saleable cellular phone and accessories in Seller's inventory (as hereinafter defined) at the close of business on the day before the date of the closing of this transaction, as will be noted on the Schedule of Saleable Inventory to be provided by Seller, allocated as follows:

(a)    In consideration of all improvements, equipment, furniture and furnishings, the sum of $30,000.00.

(b)    In consideration of the goodwill associated with the Seller's business at the above-referenced leased office, and the assignment of the leases, trade name and telephone numbers, the sum of $1,170,000.00.

(c)    In consideration of Seller's covenant not to compete as set forth in paragraph 20 below, the sum of $100,000.00.

(d)    In consideration of the saleable inventory of cellular phones and accessories, the sum to be determined by the

Law Offices of Leonard Oshinsky, P.A. - 350 East Las Olas Blvd. - Suite 970 - Fort Lauderdale, FL 33301

Schedule of that inventory to be prepared at the close of business on the day before the date of the closing of this transaction.

6.    The purchase price shall be paid as follows:

(a)    A deposit in the sum of $60,000.00, except as may otherwise be provided by this Agreement, shall be made to the trust account of Leonard Oshinsky, P.A. with the execution of this Agreement; the sum of $600,000.00, inclusive of the $60,000.00 deposit, subject to adjustments and prorations, shall be paid to Seller on the closing of this transaction (the "closing sum"). All payments shall be in the form of a wire transfer or cashier's check.

(b)    The balance of the purchase price in the sum of $700,000.00 shall be evidenced by a promissory note by the Purchaser; the notes shall be in the form set forth as Exhibit "D" attached hereto. The note, in the principal amount of $700,000.00, shall provide for that principal balance to be amortized in 6 equal and consecutive monthly installments of principal commencing thirty (30) days after the closing of this transaction and thereafter payments shall be made on the same day of each month until paid in full.

The promissory note shall be prepayable, in whole or in part, at any time without penalty, shall contain a provision for acceleration of all amounts due in the event of any default, shall contain a grace period of ten (10) days, shall provide for the highest allowable interest rate from date of default, shall be

4

secured as provided for at paragraph 7 below, and any remaining balance on the debt shall, in the event of a sale or conveyance of the assets herein being sold, immediately become due and payable, all in a form satisfactory to the Seller's attorney. Purchaser shall bear the cost of the documentary stamps due upon the execution of the promissory note.

(c) At the closing of the transaction Purchaser shall reimburse Seller for all lease deposits and prepaid rents on a store by store basis.

(d) At closing Purchaser shall pay Seller the cost value of all saleable inventory being conveyed hereby. Saleable inventory shall be that portion of the inventory of cellular phones and accessories, which Purchaser, in its sole discretion determines is saleable to customers as of the closing of this transaction.

7. As collateral security for the payment of the promissory note referred to in paragraph 6 above, the Purchaser shall execute and deliver, at the closing, a security agreement and financing statement covering all of the assets which are to be transferred hereby, including the assigned leases, and such security agreement and financing statement shall apply to the proceeds of any of the secured collateral, to any assets acquired to replace any secured collateral and to the Purchaser's accounts receivable. The security agreement shall be in the form attached hereto as Exhibit "E." Purchaser shall bear the cost of the filing fees of the UCC financing statements.

5

8.    In addition to conditions set forth elsewhere in this Agreement, this transaction is contingent upon the following:

(a)(1)    The landlord of each of the Seller's business premises must consent to the assignment of the Seller's leases to Purchaser on such terms and with such amendments as are acceptable to the Purchaser; each landlord's consent will verify the sum deposited in escrow as a security deposit and payment of the last month's rent, and acknowledge that, as of the date of landlord's consent there is no claim by the landlord against the sums held by landlord in escrow. The leases, as modified and acceptable to Purchaser, shall be assumed by Debtor and assigned to Purchaser by Court Order in accordance with Sections 363 and 365 of the Code.

(2)    The Purchaser shall on or before Friday, January 30, 2015, by emailed notice to Seller's attorney, Manuel Fente, notify Seller if it has accepted the Seller's leases, whether or not amended by the written consent of the respective landlords. If notice is not timely given the Purchaser will be deemed to have accepted the leases with amendments, if any, agreed to by the landlords. If Seller gives notice of not accepting the leases, that notice shall serve to terminate this Agreement, whereupon the deposit made hereby shall immediately be delivered to Purchaser and the parties shall have further obligation to one another.

(b)    Metro PCS must approve this transaction and enter into a dealer agreement with Purchaser for its operation at each of

6

the six (6) business locations; Metro PCS must also approve the transfer of all Seller's cellular phone inventories to Purchaser.

(c)    Seller shall provide Purchaser with the following documents within three (3) days of the effective date of this Agreement:

(1)    Miami-Dade County tangible personal property tax bills for calendar years 2012, 2013 and 2014.

(2)    Leases for each of the business premises, together with all rules and regulations promulgated by landlord (which Purchaser acknowledges as having been received before the execution of this Agreement).

(3)    All security agreements and financing statements encumbering the assets, or any part thereof, which are the subject of this transaction.

(4)    All presently effective contracts to which Seller is a party, including, but not limited to, dealer, Q Pay, supply, employment, utility, security or advertising contracts (including telephone advertising).

(5)    All outstanding and unpaid assessments imposed by the landlord or governmental authority.

(6)    Copies of all equipment leases.

(7)    A schedule of employees for the months of September, 2014 to date, noting current employees, and a payroll list for that period.

7

(8) Sales tax returns and evidence of payment of same for the years 2011 through and including 2014 and for 2015 to date.

(d) That Purchaser receives the protection of and a finding from the Court that it is a good faith purchaser as set forth in Section 363(m) of the Code.

9.    The Seller represents and agrees that pending the closing of this transaction, it shall manage and conduct its business at all of the leased premises in the ordinary course.

10.    Seller further warrants and represents as follows:

(a)    CAI INTERNATIONAL, INC. is a Florida corporation duly organized and validly existing in good standing under the laws of the State of Florida.    The execution and delivery of this Agreement and the closing of the transaction as contemplated by it will not conflict with or result in a breach of the terms, conditions or provisions of or constitute a default under its Articles of Organization or any agreement or instrument under which Seller is obligated.

(b)    Seller's sole shareholder is Avelino Vega.

(c)    Seller shall make no changes in its shareholders nor mortgage, pledge or subject to lien, charge or any other encumbrance, any of its assets, real or personal, tangible or intangible, other than in the ordinary course of business, prior to that closing.

8

(d)    Seller is and at the time of closing will be duly authorized, qualified and licensed under any applicable law, regulation, ordinance or order of a public authority to carry on its business in the places and in the manner as presently conducted.

(e)    There are, and at time of closing will be, no liabilities (including, but not limited to, liabilities for federal, state and local tax penalties and assessments) lawsuits or claims against Seller, that Purchaser shall assume or be responsible for, except as specifically provided for in this Agreement, and that have not been fully reflected in the documents provided Purchaser by the terms of paragraph 8 above. Seller is not in default in respect of any terms or conditions of any liability, commitment, indebtedness or obligation except as otherwise specifically provided for herein.

(f)    There are no actions, lawsuits or proceedings pending or threatened against Seller in law or in equity, or before any governmental agency, that if determined adversely to Seller would materially affect the business, properties, assets or condition, financially or otherwise, of Seller or its right to conduct its business as presently conducted.

(g)    Seller has filed all required federal, state and local tax returns and has paid or made provision for the payment, of all taxes that have become or may become due pursuant to those returns or pursuant to any assessment received by Seller.

9

(h)   The leases of Seller's business premises are in full force and effect and are enforceable in accordance with their terms, and that the defaults, if any, under any lease on the part of lessor or lessee shall be cured before the closing of this transaction in accordance with Section 365 of the Code.  Seller is seized of an indefeasible leasehold estate in the real property described in each lease for the term specified in it, subject to no lien, charge or encumbrance.

(i)   Seller is not a party to any material contract, agreement or understanding, whether oral or written, the obligations of which Purchaser must assume or take subject to or which affect the assets being transferred hereby, other than those provided Purchaser pursuant to paragraph above.

(j)   Seller has good and valid title to all of the assets which are to be transferred to Purchaser at closing.

11.   Each party hereto represents and warrants that there are no claims for brokerage commissions or finder's fees in connection with the transaction contemplated by this Agreement.  Each of the parties agrees to exonerate, indemnify and hold harmless the other in respect of any and all losses sustained by the other as a result of liability to any broker or finder on the basis of any arrangements or agreements made by or on behalf of such party.

12.   Purchaser warrants and represents as follows:

(a)   Purchaser is, and at the time of closing will be, duly authorized, qualified and licensed under any applicable law,

10

regulation, ordinance or order of a public authority to carry on its business in the places and in the manner as presently conducted.

(b)    Purchaser is a limited liability company duly organized and validly existing in good standing under the laws of the State of Florida.  The execution and delivery of this Agreement and the closing of the transaction as contemplated by it will not conflict with or result in a breach of the terms, conditions or provisions of or constitute a default under its Articles of Organization or any agreement or instrument under which Purchaser is obligated.

(c)  Purchaser's member manager is Moeen Khalil.

13.  At the closing Seller shall cause to be executed and delivered to Purchaser all conveyances, assignments, consents, bills of sale or other documents or instruments of transfer or assignment and all papers necessary to vest in Purchaser title to all described properties, contracts and assets of Seller, free and clear of all liens, charges or encumbrances, together with the keys to each of the business premises and such other documents reasonably requested by Purchaser's attorney.

14.  At the closing, Purchaser shall deliver to Seller the adjusted closing sum and shall cause to be executed and delivered, the promissory note, security agreement, and financing statements noted above, the acceptance of the assignments of leases, and such other documents reasonably requested by Seller's attorney.

11

15.   Seller agrees to indemnify Purchaser fully and to hold Purchaser harmless against and in respect of all demands, claims, actions or causes of actions, assessments, losses, damages, liabilities, judgments, costs and reasonable expenses, including interest and attorney's fees, asserted against Purchaser arising out of any state of facts, liability, contract, or obligation of Seller existing before the date of the closing of this transaction or otherwise existing or arising by reason of any state of facts constituting or arising out of a material breach of any covenant, representation, warranty or indemnity of Seller contained in this Agreement.  If Seller does not pay a claim or make arrangements for payment of a claim in a form acceptable to the claimant, within fifteen (15) days of demand for same by Purchaser, Purchaser shall have the right to undertake the defense of any claim and to compromise or settle it according to its best judgment, and the cost of the defense, including attorney's fees and costs, and the amount paid for any compromise or settlement of the claim and the amount of any judgment that may be entered shall be the obligation of the Seller under the provisions of indemnity provided above. Any such payments made and expenses incurred by Purchaser, including reasonable attorney's fees, with regard to third party claims indemnified hereby shall reduce Purchaser's obligation to Seller in like amount and shall be credited against the most current note payment obligation set forth at paragraph 6 above until Purchaser is fully reimbursed.

Law Offices of Leonard Oshinsky, P.A. - 350 East Las Olas Blvd. - Suite 970 - Fort Lauderdale, FL 33301

16.    Purchaser agrees to indemnify Seller fully and to hold Seller harmless against and in respect of all demands, claims, actions or causes of action, assessments, losses, damages, liabilities, judgments, costs and reasonable expenses, including interest and attorney's fees, asserted against Seller arising out of any state of facts, liability, contract, or obligation of Purchaser existing from and after the date of the closing of this transaction or otherwise existing or arising by reason of any state of facts constituting or arising out of a material breach of any covenant, representation, warranty or indemnity of Purchaser contained in this Agreement.

17.    If this Agreement is executed by both the Seller and Purchaser, and this transaction is not closed because of the fault or refusal of the Purchaser or Seller, the non-defaulting party may bring an action for specific performance and for such other legal and equitable remedies as are otherwise available to it. The prevailing party in any such action shall be entitled to an award of the costs and reasonable attorney's fees incurred in that action.

18.    The closing of the sale shall take place, ten (10) days from the entry of the Court's Order of Sale, but not later than February 16, 2015, at the office of the Purchaser's attorney, Leonard Oshinsky, in Fort Lauderdale, Florida, at 350 East Las Olas Boulevard, Suite 970.

13

If the contingencies of this Agreement have not been met before the date and time of the agreed closing, and Seller and Purchaser do not extend the date of closing by written agreement executed by each of them, this Agreement shall be deemed terminated, the Escrow Agent shall return to Purchaser the $40,000.00 deposit received by Escrow Agent pursuant to paragraph 6(a) above and upon such payment the parties shall have no further rights or obligations hereunder.

19. Any city or county occupational licenses which may be assigned by Seller to Purchaser shall be assigned with appropriate prorations of license fees accounted for at closing; Purchaser recognizes its obligation to secure proper licenses, whether or not assignable by Seller, and Purchaser will therefore take all necessary steps to secure such licenses prior to closing.

20. <u>Non-Competition Agreement</u>. Following the consummation of the transactions contemplated hereby, and in consideration thereof, neither CAI INTERNATIONAL, INC., nor its shareholders, directors or officers, or Avelino Vega, individually, (hereinafter, collectively, the "Restricted") shall, subsequent to the date of the closing and until three (3) years from the date of the closing, directly or indirectly, (a) (i) engage, whether as principal, agent, investor, distributor, representative, stockholder, employee, consultant, volunteer or otherwise, with or without pay, in any activity or business venture which is competitive with the business of the Purchaser anywhere within a two (2) mile radius of

14

any of the business premises which are the subject of this Agreement, (ii) solicit or entice or endeavor to solicit or entice away from the Purchaser any person who was a director, officer, employee, agent or consultant of such member of the Purchaser, either on their own account or for any person, firm, corporation or other organization, whether or not such person would commit any breach of such person's contract of employment by reason of leaving the service of the Purchaser, (iii) solicit or entice or endeavor to solicit or entice away any of the clients or customers of the Purchaser, either on the Restricted's directors' or officers' own account or for any other person, firm, corporation or organization, or (b) take any action or make any statement the effect of which would be, directly or indirectly, to impair the good will of the Purchaser or the business reputation or good name of the Purchaser, or be otherwise detrimental to the Purchaser, including any action or statement intended, directly or indirectly, to benefit a competitor of the Purchaser. Because the remedy at law for any breach of the foregoing provisions of this Section 22 would be inadequate, the Restricted hereby consent, in case of any such breach, to the granting by any court of competent jurisdiction of specific performance, including, but not limited to, prejudgment injunctive relief, of such provisions.

Law Offices of Leonard Oshinsky, P.A. - 350 East Las Olas Blvd. - Suite 970 - Fort Lauderdale, FL 33301

21.  <u>Reasonableness of Restrictions</u>.

A.    The Restricted have carefully read and considered the provisions of paragraph 20 hereof, and having done so with a recognition that the business of the Seller is territorial in nature, agrees that the restrictions set forth in such paragraphs (including, but not limited to, the time period of restriction and the geographical areas of restriction set forth in paragraph 22 hereof) are fair and reasonable and are reasonably required for the protection of the interests of the Purchaser.

B.    In the event that, notwithstanding the foregoing, any of the provisions of paragraph 20 shall be held to be invalid or unenforceable, the remaining provisions thereof shall nevertheless continue to be valid and enforceable as though the invalid or unenforceable parts had not been included therein.  In the event that any provision of paragraph 20 hereof relating to time period and/or areas or restriction shall be declared by a court of competent jurisdiction to exceed the maximum time period or areas such court deems reasonable and enforceable, said time period and/or areas of restriction shall be deemed to become, and thereafter be, the maximum time period and/or area which such court deems reasonable and enforceable.

22. The parties recognize that this sale is subject to notice and hearing in the Bankruptcy Case which my result in higher or better offers and that therefore while Purchaser is submitting this Agreement for Court approval Purchaser may not be the successful

16

bidder approved by the Court. The parties recognize that Purchaser has and will continue to incur expenses, including professional fees and costs, and that there is a value to the Seller and the Bankruptcy Estate in having Purchaser step forward as the "stalking horse" bidder. In recognition of the above the Parties agree that if the Purchaser is not the successful bidder at the Sale, Purchaser shall receive a breakup fee in the amount of $25,000.00 out of the sale proceeds at closing and that the approval of this breakup fee is a condition of the sale.

23. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their heirs, legal representatives, successors and assigns.

24. This Agreement shall be construed and administered in accordance with the laws of the State of Florida and the applicable provisions of the United States Bankruptcy Code.

25. This Agreement sets forth the entire understanding of the parties and cannot be modified, changed, discharged or terminated, except by written instrument executed by each of the parties.

26. All of the covenants, representations and warranties contained in this Agreement shall survive the closing of this transaction.

27. This Agreement, including all modifications and amendments thereto, either oral or written, shall remain confidential between the parties and the parties shall not disclose the terms thereof, except to the extent necessary to convey such

17

information in the reasonable course of this transaction to an accountant, lawyer or other agent, or as otherwise required by law or pursuant to lawful court order, or administrative process in the form of a subpoena, or decree of court or government agency.

28.   The parties' respective warranties and representations are limited solely to those warranties and representations listed herein.   Neither party shall reply upon any other warranties or representations, either oral or written, made by the other.

29. The Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which taken together shall constitute but one and the same instrument.   A facsimile copy or a scanned and emailed or efaxed signed copy shall for all purposes be deemed to be an original.


IN WITNESS WHEREOF, the parties hereto have executed this Agreement this _____ day of January, 2015.


Witnesses:                          Purchaser:

                                    WIRELESSPCS FL, LLC

_____     By:_____
                                         Moeen Khalil, Member-Manager
_____

18

<u>Seller:</u>

Debtor in Possession

CAI INTERNATIONAL, INC.

By: _____
      Avelino Vega, President

_____
AVELINO VEGA, individually
f o r   t h e   p u r p o s e   o f
acknowledging and agreeing to
be bound by the terms of
paragraphs 20 and 21 of this
Agreement

STATE OF            )
                    ) SS:
COUNTY OF         )

     The foregoing instrument was acknowledged before me this ____
day of January, 2015, by MOEEN KHALIL, as member-manager of
WIRELESSPCS FL, LLC and individually, who, as indicated below, is
either personally known to me or who has produced the
identification noted and who did take an oath.

[  ] Personally known to me

[  ] Produced identification _____
                           (Type of I.D.)

_____
NOTARY PUBLIC
State of _____ at Large

My Commission expires:

19

```
STATE OF              )
                      ) SS:
COUNTY OF             )
```

    The foregoing instrument was acknowledged before me this ____ day of January, 2015, by AVELINO VEGA, as president of CAI INTERNATIONAL, INC. and individually, who, as indicated below, is either personally known to me or who has produced the identification noted and who did take an oath.

[  ] Personally known to me

[  ] Produced identification _____

                                      (Type of I.D.)

                                      _____

                                      NOTARY PUBLIC
                                      State of _____ at Large

My Commission expires:                             jb45808

Law Offices of Leonard Oshinsky, P.A. - 350 East Las Olas Blvd. - Suite 970 - Fort Lauderdale, FL 33301

## EXHIBIT "A"

### BUSINESS LOCATIONS/LEASED PREMISES

1.   15935 NW 57th Avenue, Miami Lakes, FL 33014          (#101)

2.   957 SW 27th Avenue, Miami, FL 33135          (#102)

3.   1138 West 49th Street, Hialeah, FL 33012          (#206)

4.   635 West 49th Street, Hialeah, FL 33012          (#207)

5.   3705 West 20th Avenue, Suite 145, Hialeah, FL 33012   (#115)

6.   18600 NW 87th Avenue, Suite 126, Miami, FL 33018   (#117)

21

EXHIBIT "B"

SCHEDULE OF PHONE NUMBERS

1.    15935 NW 57th Avenue, Miami Lakes, FL 33014
          305/621-5300
          305/826-2019

2.    957 SW 27th Avenue, Miami, FL 33135
          786/953-5364
          305/541-5099

3.    1138 West 49th Street, Hialeah, FL 33012
          305/512-0151
          305/698-7433

4.    635 West 49th Street, Hialeah, FL 33012
          305/384-7388
          305/557-1278

5.    3705 West 20th Avenue, Suite 145, Hialeah, FL 33012
          305/820-9970
          305/820-9948

6.    18600 NW 87th Avenue, Suite 126, Miami, FL 33018
          305/829-3357
          305/829-3365

Law Offices of Leonard Oshinsky, P.A. - 350 East Las Olas Blvd. - Suite 970 - Fort Lauderdale, FL 33301

**COMPOSITE EXHIBIT "C"**

jb45808

# Fixed Assets for List 101

| Description | Model | Serial Number |
|---|---|---|
| **Computers** | NO WHQL<br>HP Pavillion | 106892578<br>MXU9120JYY |

| | | |
|---|---|---|
| **Computer Monitors** | LG Flatron W2053TQV<br>Hanns. G HSG1044 | 904NDDM98122<br>006DY3XY01695 |

| | | |
|---|---|---|
| **Printers** | Dell 2335DN<br>CITIZEN | CN-01NCHC-772211-29J-0008<br>990366 |

| | |
|---|---|
| **Furniture & Fixtures** | All Furniture with Metro PCS Product |

| | |
|---|---|
| **Systems & Equipemnt** | Alram System<br>(2) Bar Scanners<br>(1) Cellbrite Machine<br>(1) Camera Montioring System<br>(3) Video Montitoring Cameras<br>(1) 22' TV/Monitor in front of Store<br>(1) Wi-Fi system as need for store |

| | |
|---|---|
| **Signage** | (1) Outside Metro PCS Signs |

# Fixed Assets for List 102

| Description | Model | Serial Number |
|---|---|---|
| **Computers** | Dell | CNOG662F74261868511U |
| | Superpower | N/A |
| | HP | SNMXL0510645 |
| | AOC | MXU9460H4L |
| | Dell | SFJDDQ1 |
| | Superpower | N/A |

| Description | Model | Serial Number |
|---|---|---|
| **Computer Monitors** | DELL | 7HJP3J1 |
| | AOC | T9RSNFNKUWANN |
| | AOC | X609BHA023258 |
| | AOC | L218CJA017155 |
| | AOC | SW40059JA041310 |
| | AOC | SW40059JA041525 |
| | AOC | N/A |
| | DELL | CN-OVXV49-72872-273-AMDI |

| Description | Model | Serial Number |
|---|---|---|
| **Printers** | HP LASER JET P2055DN | CNB9005609 |
| | DELL ALL IN ONE 2335DN | CN-01NCHC-72 |
| | CITIZEN | 840053 |
| | CITIZEN | 543024 |
| | CITIZEN | 341341 |
| | CITIZEN | O8Y0049 |
| | CITIZEN | 990367 |

| Description | Model |
|---|---|
| **Furniture & Fixtures** | Glass desk for Office |
| | All Furniture with Metro PCS Product |
| | Radio System |
| | 3 Palstic racks |
| | 40 Palstic bins |
| | (1) Refrigirator |
| | (2) Microwave's |
| | (1) Two Drawer file cabinet |
| | (1) Custom steel cage for phone |
| | (1) Mop & bucket |
| | (1) Wet floor sign |
| | (6) Client chairs |

| Description | Model |
|---|---|
| **Systems & Equipemnt** | Alram System |
| | (6) Bar Scanners |
| | (2) Cellbrite Machine |
| | (1) Camera Montioring System |
| | (4) Video Montitoring Cameras |
| | (1) 19' TV/Monitor in front of Store |
| | (1) Wi-Fi system as need for store |

| Description | Model |
|---|---|
| **Signage** | (2) Outside Metro PCS Signs |

# Fixed Assets for List 115

| Description | Model | Serial Number |
|---|---|---|
| **Computers** | Dell | SN:DZPYXB1 |
| | Dell | SN:FGW6DG1 |
| | Dell | SN:8GN2KM1 |
| | Dell | SN:6ZPYXV1 |
| | Dell | SN:DC9KM1 |
| | Dell | SN:HZPYXV1 |
| | Dell | SN:DZ6QFQ1 |

| | | |
|---|---|---|
| **Computer Monitors** | Dell | CN-OY9998-7872-667-4COT |
| | COMPAC | CN-3CQ9260JN2 |
| | Dell | CN-OY998-72872-667-491T |
| | Dell | CN-OHX948-64180-84L-1WDL |
| | Dell | CN-OY9998-72872-668-043T |
| | Dell | CN-OT571R-64180-9BP-079M |
| | SAMSUNG | WJ19H9FG502813Z |

| | | |
|---|---|---|
| **Printers** | HP LASER JET P2055DN | CNB9005561 |
| | DELL ALL IN ONE 2335DN | CN-OKW451-72214-CPI-0044 |
| | CITIZEN | 0660897 |
| | CITIZEN | 0341449 |
| | CITIZEN | 0461533 |
| | CITIZEN | 0341473 |
| | CITIZEN | 0821849 |
| | CITIZEN | 0971718 |
| | CITIZEN | 0912489 |

| | |
|---|---|
| **Furniture & Fixtures** | Glass desk for Office |
| | Radio System |
| | 8 Palstic racks |
| | 60 Palstic bins |
| | (1) Refrigirator |
| | (1) Microwave's |
| | (2) FourDrawer file cabinet |
| | (1) Custom steel cage for phone |
| | (2) Mop & bucket |
| | (1) Wet floor sign |
| | (15) Client chairs |

| Systems & Equipemnt | Alram System |
| --- | --- |
| | (6) Bar Scanners |
| | (2) Cellbrite Machine |
| | (1) Camera Montioring System |
| | (5) Video Montitoring Cameras |
| | (1) 24" TV/Monitor in front of Store |
| | (1) Wi-Fi system as need for store |

| Signage | (3) Outside Metro PCS Signs  (1) Pilon Sign |
| --- | --- |

# Fixed Assets for List 117

| Description | Model | Serial Number |
|---|---|---|
| **Computers** | Dell | 00196-157-963-625 |
| | Dell | 00196-157-979-875 |

| Description | Model | Serial Number |
|---|---|---|
| **Computer Monitors** | DELL | SN:CN-0D176P-64180-11H-0R1M |
| | Acer | ETL510857872708F7C422C |

| Description | Model | Serial Number |
|---|---|---|
| **Printers** | HP LASER JET P2055DN | 01NCH-72211291-0110 |
| | DELL ALL IN ONE 2335DN | CNB9005563 |
| | CITIZEN | 780279 |
| | CITIZEN | 08X2711 |

| Description | Model |
|---|---|
| **Furniture & Fixtures** | Wood desk for Office |
| | 2 Palstic racks |
| | (1) Refrigirator |
| | (1) Microwave's |
| | (1) Two Drawer file cabinet |
| | (1) Custom steel cage for phone |
| | (1) Mop & bucket |
| | (2) Wet floor sign |
| | (3) Client chairs |

| Description | Model |
|---|---|
| **Systems & Equipemnt** | Alram System |
| | (1) Bar Scanners |
| | (1) Cellbrite Machine |
| | (1) Camera Montioring System |
| | (4) Video Montitoring Cameras |
| | (1) 24' TV/Monitor in front of Store |
| | (1) Wi-Fi system as need for store |

| Description | Model | Serial Number |
|---|---|---|
| **Signage** | (1) Outside Metro PCS Signs | (1) Pilion Sign |

# Fixed Assets for List 206

| Description | Model | Serial Number |
|---|---|---|
| **Computers** | Compaq | 00144-131-991-854 |
| | Compaq | 00144-130-286-584 |
| | Dell | 00196-058-035-832 |
| | Compaq | 00144-131-991-583 |
| | Compaq | 00144-131-991-582 |
| | Compaq | 00144-131-991-585 |

| Description | Model | Serial Number |
|---|---|---|
| **Computer Monitors** | Compaq | 3CQ9233CHP |
| | Compaq | 3CQ9223BOB |
| | Compaq | 3CQ9233B5F |
| | Compaq | 3CQ9233CJK |
| | DELL | 01PTX3-64180-056-0K4M |
| | Compaq | 3CQ9233CHR |

| Description | Model | Serial Number |
|---|---|---|
| **Printers** | HP LASER JET P2055DN | CNB9005562 |
| | HP LASER JET P2055DN | CNB9005548 |
| | DELL ALL IN ONE 2335DN | CN-01NCHC-7211-29J-0010 |
| | CITIZEN | 0962093 |
| | CITIZEN | 0822269 |
| | CITIZEN | 0660949 |
| | CITIZEN | 0962094 |
| | CITIZEN | 0962098 |

| Description | Model |
|---|---|
| **Furniture & Fixtures** | Wood desk for Office |
| | 7 Palstic racks |
| | (1) Refrigirator |
| | (1) Microwave's |
| | (1) Locker cabinet |
| | (1) Custom steel cage for phone |
| | (1) Mop & bucket |
| | (1) Wet floor sign |
| | (4) Client chairs |

| Description | Model |
|---|---|
| **Systems & Equipemnt** | Alram System |
| | (5) Bar Scanners |
| | (1) Cellbrite Machine |
| | (1) Camera Montioring System |

(6) Video Montitoring Cameras
(1) 24' TV/Monitor in front of Store
(1) Wi-Fi system as need for store

| *Signage* | (1) Outside Metro PCS Signs |

# Fixed Assets for List
## 207

| Description | Model | Serial Number |
|---|---|---|
| **Computers** | Dell | 00186-1897-645-816 |
| | Dell | 00186-187-645-749 |
| | Dell | 00186-188-555-272 |
| | Dell | 00186-188-555-123 |
| | Dell | 00186-188-555-233 |
| | Dell | 00186-188-555-298 |

| | | |
|---|---|---|
| **Computer Monitors** | DELL | CN-07N012-64180-28M054M |
| | Dell | CN-07N012-64180-28M04BM |
| | Dell | CN-07N012-64180-28M04BM |
| | Dell | CN-07N012-64180-28M04BM |
| | Dell | CN-07N012-64180-28M04BM |
| | DELL | CN-07N012-64180-28M04BM |

| | | |
|---|---|---|
| **Printers** | HP LASER JET P2055DN | |
| | DELL ALL IN ONE 2335DN | |
| | CITIZEN | SN:1291937 |
| | CITIZEN | SN:0962096 |
| | CITIZEN | SN:1291938 |
| | CITIZEN | SN:0780221 |
| | CITIZEN | SN:1291542 |

| | |
|---|---|
| **Furniture & Fixtures** | Wood desk for Office |
| | 2 Palstic racks |
| | 15 Palstic bins |
| | (1) Refrigirator |
| | (1) Microwave's |
| | (1) Four Drawer file cabinet |
| | (1) Mop & bucket |
| | (1) Wet floor sign |
| | (4) Client chairs |

| | |
|---|---|
| **Systems & Equipemnt** | Alram System |
| | (3) Bar Scanners |
| | (2) Cellbrite Machine |
| | (1) Camera Montioring System |
| | (6) Video Montitoring Cameras |

(1) 24' TV/Monitor in front of Store
(1) 32' TV/Monitor in front of Store
(1) Wi-Fi system as need for store

| *Signage* | (2) Outside Metro PCS Signs | (1) Pilion Sign |

EXHIBIT "D"

## PROMISSORY NOTE

$700,000.00                                    Fort Lauderdale, Florida
                                               February _____, 2015


FOR VALUE RECEIVED the undersigned WIRELESSPCS FL, LLC, hereby promises to pay to the order of CAI INTERNATIONAL, INC., at _____ _____, or such other place or places as the payee or holder hereof may designate in writing, from time to time, the principal sum of Seven Hundred Thousand and no/100ths ($700,000.00) Dollars, in lawful money of the United States of America.

Said sum shall be paid in six (6) equal installments of principal in the amount of $116,666.67.

The first payment shall be due and payable on the _____ day of March, 2015, and thereafter payments shall be made on the _____ _____ day of each month, with a final payment due on August _____, 2015.

All payments hereunder shall be made in lawful currency of the United States of America.

The maker of this note hereby waives demand, presentment, notice of nonpayment, dishonor and protest and agrees in case suit shall be brought for the collection hereof, or, if it is necessary, to place the same in the hands of an attorney for collection, to pay reasonable attorney's fees for making such collection, whether by suit or otherwise, in both trial and appellate courts, whether the holder hereof is obligated therefore or not.

During the period of any default under the terms of this promissory note, the interest rate on the entire indebtedness then outstanding shall be at the highest rate of interest permitted by law. All payments on this promissory note shall be applied first to interest and the remainder, if any, to principal.

If default is made on the payment of any installment of interest, or any other sum required to be paid hereunder, then, at the option of the payee, the entire principal sum remaining unpaid, together with accrued interest thereon, shall become immediately due and payable without notice.  This note shall not be deemed to be in default as to any payment made within ten (10) days of its due date.

It is the intention of the parties hereto to comply strictly with all applicable usury laws; and, accordingly, in no event and upon no contingency shall any party be entitled to receive, collect or apply as interest, any interest, fees, charges or other payments equivalent to interest, in excess of the maximum amount which may be charged from time to time under the applicable law, and in the event that any party ever receives, collects or applies as interest any such excess, such amount which would be excessive interest shall be applied to the reduction of the principal amount of the indebtedness evidenced hereby; and if the principal amount of the indebtedness evidenced hereby and all interest thereon is paid in full, any remaining excess shall forthwith be paid to the maker or other party lawfully entitled thereto. In determining whether or not the interest paid or payable, under any special contingency, exceeds the maximum which may be lawfully charged, the maker and the party receiving such payment shall, to the maximum extent permitted under applicable law, characterize any non-principal payment as an expense, fee or premium, rather than as interest. Any provision hereof or of any other agreement between the parties hereto that operates to bind, obligate or compel the maker to pay interest in excess of such maximum rate, shall be construed to require the payment of the maximum rate only.

This note is subject to the terms and conditions of the Agreement, dated January _____, 2015 by and between the Maker and Payee herein.

This note may not be modified or amended orally.

WIRELESSPCS FL, LLC

By:_____
        Moeen Khalil, Manager

jb45809

2

EXHIBIT "E"

# SECURITY AGREEMENT
## (CHATTEL MORTGAGE)

**THIS AGREEMENT,** made this _____ day of February, 2015 under the laws of the State of

Florida, between **WIRELESSPCS FL, LLC,** herein called the Debtor, whose business address is 14537 Military

Trail, Suite B, Delray Beach, FL 33484, and **CAI INTERNATIONAL, INC.,** herein called the Secured Party,

whose address is _____.

### W I T N E S S E T H:

To secure the payment of an indebtedness in the amount of $700,000.00, with interest, payable as

follows:

> Seven Hundred Thousand and no/100ths ($700,000.00) Dollars payable in
> six (6) equal monthly installments of principal in the amount of $116,666.67
> with the first payment being due on March _____, 2015 and thereafter
> five (5) consecutive monthly installments on the _____ day of each month,
> with a final payment due on August _____, 2015.

as evidenced by the note of even date herewith, and also to secure any other indebtedness or liability of the
Debtor to the Secured Party direct or indirect, absolute or contingent, due or to become due, now existing or
hereafter arising, including all future advances or loans which may be made at the option of the Secured
Party, (all hereinafter called the "obligations") Debtor hereby grants and conveys to the Secured Party a
security interest in, and mortgages to the Secured Party,
    (a)    the property described in the schedule herein (hereinafter called the collateral), which
collateral the Debtor represents will be used primarily

___for personal, family or household purposes  ___in farming operations  _X_ in business or other use

    (b)    all property, goods and chattels of the same classes as those scheduled, acquired by the
Debtor subsequent to the execution of this Agreement and prior to its termination

    (c)    all proceeds thereof, if any

    (d)    all increases, substitutions, replacements, additions and accessions thereto.

## DEBTOR WARRANTS, COVENANTS AND AGREES AS FOLLOWS:

To pay and perform all of the obligations secured by this Agreement according to their terms.
    To defend the title to the collateral against all persons and against all claims and demands
whatsoever, which collateral, except for the security interest granted hereby, is lawfully owned by the Debtor

and is now free and clear of any and all liens, security interests, claims, charges, encumbrances, taxes and assessments except as may be set forth in the schedule.

On demand of the Secured Party to do the following: furnish further assurance of title, execute any written agreement or do any other acts necessary to effectuate the purposes and provisions of this Agreement, execute any instrument or statement required by law or otherwise in order to perfect, continue or terminate the security interest of the Secured Party in the collateral and pay all costs of filing in connection therewith.

To retain possession of the collateral during the existence of this Agreement and not to sell, exchange, assign, loan, deliver, lease, mortgage or otherwise dispose of same without the written consent of the Secured Party.

To keep the collateral at the location specified in the schedule and not to remove same (except in the usual course of business for temporary periods) without the prior written consent of the Secured Party.

To keep the collateral free and clear of all liens, charges, encumbrances, taxes and assessments.

To pay, when due, all taxes, assessments and license fees relating to the collateral.

To keep the collateral at Debtor's own cost and expense, in good repair and condition and not to misuse, abuse, waste or allow to deteriorate except for normal wear and tear and to make same available for inspection by the Secured Party at all reasonable times.

To keep the collateral insured against loss by fire (including extended coverage), theft, and other hazards as the Secured Party may require and to obtain collision insurance, if applicable. Policies shall be in such form and amounts and with such companies as the Secured Party may designate. Policies shall be obtained from responsible insurors, authorized to do business in this state. Certificates of insurance or policies, payable to the respective parties as their interest may appear, shall be deposited with the Secured Party who is authorized, but under no duty, to obtain such insurance upon failure of the Debtor to do so. Debtor shall give immediate written notice to the Secured Party and to insurors of loss or damage to the collateral and shall promptly file proofs of loss with insurors. Debtor hereby appoints the Secured Party the attorney for Debtor in obtaining, adjusting and canceling any such insurance and endorsing settlement drafts and hereby assigns to the Secured Party all sums which may become payable under such insurance, including return premiums and dividends, as additional security for the indebtedness.

If this Agreement is security for a loan to be used to pay a part or all of the purchase price of the collateral; to use the proceeds of the loan to pay the purchase price, filing fees and insurance premiums. The Secured Party, however, may pay the proceeds directly to the seller of the collateral.

To immediately notify the Secured Party in writing of any change in or discontinuance of Debtor's place or places of business and/or residence.

That if the collateral has been attached to or is to be attached to real estate, a description of the real estate and the name and address of the record owner is set forth in the schedule herein; if the said collateral is attached to real estate prior to the perfection of the security interest granted hereby, Debtor will on demand of the Secured Party furnish the latter with a disclaimer or disclaimers, signed by all persons having an interest in the real estate, of any interest in the collateral which is prior to Secured Party's interest.

## THE PARTIES FURTHER AGREE

Notes, if any, executed in connection with this Agreement, are separate instruments and may be negotiated by Secured Party without releasing Debtor, the collateral, or any guarantor or co-maker. Debtor consents to any extension of time of payment. If there be more than one Debtor, guarantor or co-maker of this Agreement or of noted secured hereby, the obligation of all shall be primary, joint and several.

Waiver of or acquiescence in any default by the Debtor, or failure of the Secured Party to insist upon strict performance by the Debtor of any warranties or agreements in this Security Agreement, shall not constitute a waiver of any subsequent or other default or failure.

Notices to either party shall be in writing and shall be delivered personally or by mail addressed to the party at the address herein set forth or otherwise designated in writing.

The Uniform Commercial Code shall govern the rights, duties and remedies of the parties and any provisions herein declared invalid under any law shall not invalidate any other provision or this Agreement.

The following shall constitute a default by Debtor:

2

Failure to pay the principal or any installment of principal or of interest on the indebtedness or any notes when due.

Failure by the Debtor to comply with or perform any provision of this Agreement.

False or misleading representations or warranties made or given by Debtor in connection with this Agreement.

Subjection of the collateral to levy of execution or other judicial process.

Commitment of any solvency proceeding by or against the Debtor or of any guarantor of or surety for the Debtor's obligations.

Death of the Debtor or of any guarantor or surety for the Debtor's obligations.

Any reduction in the value of the collateral or any act of the Debtor which imperils the prospect of full performance or satisfaction of the Debtor's obligations herein.

Upon any default of the Debtor and at the option of the Secured Party, the obligations secured by this Agreement shall immediately become due and payable in full without notice or demand and the Secured Party shall have all the rights, remedies and privileges with respect to repossession, retention and sale of the collateral and disposition of the proceeds as are accorded to a Secured Party by the applicable sections of the Uniform Commercial Code respecting "Default," in effect as of the date of this Security Agreement.

Upon any default, the Secured Party's reasonable attorney's fees and the legal and other expenses for pursuing, searching for, receiving, taking, keeping, storing, advertising, and selling the collateral shall be chargeable to the Debtor.

The Debtor shall remain liable for any deficiency resulting from a sale of the collateral and shall pay any such deficiency forthwith on demand.

If the Debtor shall default in the performance of any of the provisions of this Agreement on the Debtor's part to be performed, Secured Party may perform same for the Debtor's account and any monies expended in so doing shall be chargeable with interest to the Debtor and added to the indebtedness secured hereby.

In conjunction with, addition to or substitution for those rights, Secured Party, at his discretion, may: (1) enter upon Debtor's premises peaceably by Secured Party's own means or with legal process and take possession of the collateral, or render it unusable, or dispose of the collateral on the Debtor's premises and the Debtor agrees not to resist or interfere; (2) require Debtor to assemble the collateral and make it available to the Secured Party at a place to be designated by the Secured Party, reasonably convenient to both parties (Debtor agrees that the Secured Party's address as set forth above is a place reasonably convenient for such assembling); (3) unless the collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market; Secured Party will give Debtor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. The requirements of reasonable notice will be met if such notice is mailed, postage prepaid, to the address of the Debtor shown above, at least three days before the time of sale or disposition.

Secured Party may assign this Agreement and if assigned, the assignee shall be entitled, upon notifying the Debtor, to performance of all of Debtor's obligations and agreements hereunder and the assignee shall be entitled to all of the rights and remedies of the Secured Party hereunder. Debtor will assert no claims or defenses Debtor may have against the Secured Party against the assignee.

The Secured Party is hereby authorized to file a financing statement.

The terms, warranties and agreements herein contained shall bind and inure to the benefit of the respective parties hereto, and their respective legal representatives, successors and assigns.

The gender and number used in this Agreement are used as a reference only and shall apply with the same effect whether the parties are of the masculine or feminine gender, corporate or other form, and the singular shall likewise include the plural.

This Agreement may not be changed orally.

3

**IN WITNESS WHEREOF,** the parties have respectively signed and sealed these presents the day and year first above written.

WIRELESSPCS FL, LLC

By:_____

    Moeen Khalil, Manager

CAI INTERNATIONAL, INC.

By:_____

    Avelino Vega, President

### SCHEDULE

Describe items of collateral, the address where each item will be located and describe any prior liens, etc., and the amounts due thereon.  If items are crops or goods affixed to real estate, describe the real estate and state the name and address of the owner of record thereof.

ITEMS                                           LOCATION, ETC.

All of the assets of the Debtor including all leasehold      See Schedule "A" attached hereto
improvements, furnishings and fixtures, equipment,
accounts receivable, saleable inventory, shelving, lease
and utility deposits, all right, title and interest o f lessee
in the leases for the premises located as noted on
Schedule "A" attached hereto

The chief place of business of the Debtor, if other than stated in this Agreement, is:

                                                                        jb45810

4

## SCHEDULE "A"

### BUSINESS LOCATIONS/LEASED PREMISES

1.      15935 NW 57th Avenue, Miami Lakes, FL 33014  (#101)

2.      957 SW 27th Avenue, Miami, FL 33135  (#102)

3.      1138 West 49th Street, Hialeah, FL 33012  (#206)

4.      635 West 49th Street, Hialeah, FL 33012  (#207)

5.      3705 West 20th Avenue, Suite 145, Hialeah, FL 33012  (#115)

6.      18600 NW 87th Avenue, Suite 126, Miami, FL 33018  (#117)

jb45810

5

**Exhibit** B

**Acquired Stores**

located in Miami-Dade County, Florida:

(a)  15935 N.W. 57th Aenue (Store Front Only), Miami Lakes, Florida;

(b) 3705 W. 20th Avenue, Hialeah, Florida;

(c) 1138 W. 49th Street, Hialeah, Florida;

(d) 18600 N.W. 87th Avenue, Miami, Florida;

(e) 957 S.W. 27th Avenue, Miami, Florida;

 (f) 635 W. 49th Street, Hialeah, Florida.